Last case on this morning's docket is the case of Marriage of James Williamson versus Melissa Williamson. We have Ms. Julie Cates for Katz for the appellant, and we have Mr. John Womack for the appellee. You may begin, Ms. Katz. My name is Julie Katz, and I represent the appellant in this matter, Melissa Williamson. This case is an appeal taken from a judgment of dissolution marriage issued by Judge Babcock in St. Clair County on June 29, 2009. The dissolution proceeding was filed by James Williamson, who is a sitting circuit judge in Johnson County, against my client, Melissa Williamson. Parties had been married more than 40 years at the time of the trial. Melissa was 66 years old when the judgment was entered, and they had one daughter together, a 33-year-old daughter who was married at the time of the trial. Melissa was not employed at the time of the trial and had not been for approximately 34 years, having been a homemaker until the parties separated in 2007. In addition to her lack of work experience, she suffered from numerous health conditions, which I'll have to read to you because there are too many to remember. She had been diagnosed with common variable immune deficiency, type 2 diabetes, hypothromboembolism, hypothyroidism, rhinitis, hammertoes, depression, scoliosis, high blood pressure, chronic ear problems, a prolapsed bladder, cataracts, and chronic gastritis. And she testified that all those conditions made her unable to stand for any substantial period of time and affected her daily activities. James, on the other hand, had been a circuit judge for 31 years at the time of the trial. His gross salary in 2008 from his position as a judge was $162,164.36, and he also had income from his non-marital investments of another $56,000. So his total income during 2008 had been just under $220,000. Is that gross? That's a gross sum. That's gross, absolutely. I'll talk about that income in just a minute, but that was gross. And then he also had non-marital property valued at $1,070,537.60. So the judgment of dissolution of marriage that was given by Judge Valka awarded Melissa reviewable maintenance of $4,500 per month, and he ordered that review to happen after the sale of the marital residence and after James retired. The parties owned that house, that was 4,000 square feet at that time, and the court had ordered that that property be sold, and if it wasn't sold within 90 days, it was to be auctioned. And Melissa was to receive, under the judgment, 60% of the sales proceeds, and James was to receive 40%. Now, Mr. Womack has attached to his brief an appendix showing that after the judgment was entered, the parties reached an agreement whereby she received the marital residence, and in exchange, he received other property, other real estate and other personal properties. So they were able to reach an agreement. So that is now the situation, that Melissa's in the marital home, and that was awarded to her. It was not sold. The judgment also found Melissa to have dissipated marital assets in the amount of $115,528.92. After the court made that finding, he then ordered her to pay all of the marital debt, which was $62,142.46. So what he did was he ordered James to pay Melissa $4,378 in order to equalize the difference between his half of the amount dissipated and the total amount of the marital debt, which he then ordered Melissa to pay. She also received half of the pension that he had earned at that point in time, and he was ordered to make her as beneficiary of $500,000 of life insurance, and he was also ordered to pay her COBRA premium of 36 months. She had incurred attorney fees in excess of $40,000, $44,000 and some change, and he was ordered to pay $5,000 of those fees. So we are here today raising several issues that we think were incorrect with Judge Gapka's decision. The first ruling that we take issue with is the fact that he gave Melissa a reviewable maintenance of $4,500 per month. This was clearly a case where she should have been awarded permanent maintenance. Reviewable could go up or down, though, isn't that correct? That's correct, Your Honor, it could. But if it were permanent maintenance, then it would be Jamesburg that come before this court, if, for example, at the time of retirement, and show that there's been a substantial change of circumstances, which the court may or may not feel that there had been that showing. Well, if and when he retires, what would be the pension payout to her on a monthly basis? When he retires, she was going to get half of the marital portion, so certainly he would get credit for the years following the entry of the judgment. She would get half of what he earned up until that time, but since he's not yet retired, we don't know. Have you computed what that's worth on a monthly basis? Well, it's hard to know, because he's not retired yet, so he's continuing to earn that pension. So I'm not sure what the ultimate percentage will end up being. Well, actually, if he's been a judge for 31 years, he's probably missed out. So then I would assume that 80% of the $162,000, she'll be getting half of that monthly amount. Actually, isn't it 85%? I'm not positive, because that wasn't in the record. It's 85% plus 3%, because you don't pay state income tax on it. So it's really 85%. Obviously, he would have that income, too. I mean, they need to be receiving that income. The point is, wouldn't that make sense to make the maintenance reviewable, depending on the circumstances? Well, Your Honor, if it were a permanent maintenance award, he would have the right to come in and say, hey, there's been a significant change of circumstances. I'm now retired. I want to modify the maintenance. And then it would be his burden. But under review, it's not necessarily his burden. The court didn't say what's supposed to happen between now and that review period. Is she under a duty to go out and to try to find employment, given her age and her health conditions? I think the trial court already found her to be unemployable because of her medical conditions. And because of that, I feel it should have been a permanent maintenance, because to come back in on a review, the burden wouldn't have been on James to show a change of circumstances. We'd be hearing it all over again. I think the more appropriate ruling and the correct ruling would have been, given permanent maintenance, it is modifiable, but it becomes his burden to come back in. And the court may or may not have thought there was a substantial change of circumstances when he comes back in with 85% of his income still. The court may have said, I don't think there's a substantial change. I'm not going to take away your maintenance. But our position is it should have been permanent, subject to him having that right, but otherwise, not an automatic review, not making him come back before the court, without any clear direction as to what's supposed to happen between now and that date of review. And I think it's clear that this was a permanent maintenance case. The testimony showed that during their 40 years, she dedicated herself to the care of their daughter. Their daughter had numerous health conditions that made her have to take the child to the pediatrician frequently. They made the decision when she was school-age to put the child in private school in Paducah, Kentucky, which was about a 70-mile round trip. That trip had to be made twice a day, take her to school and pick her back up. He also had requests that he made of Melissa himself. James did with regard to his meals. She was expected to have a large meal on the table every day. He didn't like canned foods. Everything was to be fresh. His favorite request, apparently, was chicken with the skin off. She was to make that meal on a daily basis. She also was forced to, I shouldn't say forced, but she was requested to help when his mother became ill. And from 1993 to 2000, she had to render assistance for seven years, render assistance to his mother, who needed help with all types of things. She had to take his mother to the doctor. She had to clean, do the ironing, do the washing. She had to cook the mother's meals. She had to give her her medication. And she had to attend to her personal hygiene needs. So this is obviously a case where she sacrificed her own career in order to meet the needs of her husband, the home, her husband's mother, and their daughter. And this was clearly a case of permanent maintenance. She also had extensive health problems, which I've already listed. All of that, her age, the extensive health problems, and the lack of work experience, all justified an award of permanent maintenance in this case. And I cited a couple of cases on page 10 of my brief that I thought had particularly instructive language, the Mayhall case and the Rubenstein case. And they look at facts that are similar to the facts in this case. And the Mayhall case talks about, there are, of course, cases where it is so clear that the recipient is not employable or is employable only at a low income compared to the previous standard of living that it is appropriate to award maintenance without a provision for review. And that's the Mayhall case. And then the Rubenstein case also has some instructive language where it talks about, there's no question but that Illinois courts give consideration to a more permanent award of maintenance to wives who have undertaken to have children raised in support of the family and who have lost or been substantially impaired in maintaining their skills for continued employment during the years when the husband was getting his education and becoming established. That clearly meets the circumstances in this case as well. And I think an award of permanent maintenance was the only appropriate award here. Besides the fact that it was reviewable, it also wasn't sufficient as far as the amount. She was awarded $4,500 per month, but her financial statement showed monthly expenses of slightly over $9,800 per month. James, on the other hand, had a net income, and this is where Justice Fletcher asked about his net income of $11,092 per month. After he paid his own monthly expenses and after he paid her COBRA premium, he still had $7,796 per month net that was available to pay maintenance. So in spite of the fact that her monthly expenses exceeded $9,800, he didn't even give her the full $7,700 that was left after he met his own needs and paid the COBRA premium, Judge Becker only gave Melissa $4,500 per month. That left James with $3,296, more than his entire monthly living expenses for the month. He had that much left each month with which to meet his expenses, so Melissa's trying to struggle to meet her expenses with the income that she had, while James is sitting on more than 100% of his monthly budget that he can pocket away, not to mention that he has over a million dollars in non-marital assets. So clearly, the amount should have been higher. In addition, Judge Becker only ordered James to pay $5,000 of the fees that Melissa incurred in this case. Her fees were $44,926.85. And under 750 ILCS 508A, this clearly is a case where one party, Melissa, has shown the inability to pay her fees, whereas James has the ability to pay those fees. I've already argued to you that the maintenance she got was not sufficient to meet her needs every month, so she wasn't gonna have extra income each month to try to make a fee payment. She also had marital debt of over $62,000 that she was gonna have to try to pay. So it becomes clear that the only way she's gonna be able to pay her attorney fees is to sell the marital real estate in order to do that. And the case law clearly states that she shouldn't have to sell marital asset in order to pay her fees. That was the biggest marital asset, and she shouldn't have to sell that in order to pay her fees, especially when James had a cash flow that I've just mentioned to you of over $3,000 per month over and above his expenses and the maintenance that he was ordered to pay that he could use to pay her fees, as well as his non-marital assets of more than a million dollars. He testified that his own attorney fees were only $10,000 plus whatever his expenses were, so his fees were substantially less. He certainly should have been ordered to pay all or at least a substantial portion of Melissa's fees. Another issue that we have raised in our brief is the fact that Judge Vathakai, I think, felt constrained by the Elegy decision not to award more life insurance coverage than what he did. There had been a request made by Melissa to order more than the $500,000 life insurance policy that James in open court said he would maintain with her as beneficiary. And the court in the judgment talks about he felt that based on the Elegy case, he couldn't order more than that, and I think he felt that the only reason he could order the $500,000 that he ordered was because he had stipulated in open court that he would do that. And I think it's important for this court to rule on this issue and give guidance to the court because the third district in Ellinger said that it's not appropriate to order life insurance coverage to secure a maintenance obligation, but the Walker case, which I cited, which is a fourth district case, says that it is appropriate, and I think it's the better reason case. And I would ask this court to follow the Walker case and to please find that it's appropriate to order the life insurance coverage to secure the maintenance. And I think the court may or may not order more than that, but I think when you read the judgment that was entered, it becomes real clear that Judge Gaffer thought he could. So I think it's important for this court to tell Judge Gaffer that he could and that it could be remanded for him to determine whether or not he should have ordered more than the $500,000. But I think he felt that he had to follow the Ellinger case, and I think the Walker case is the better reason case. Did you determine what the present cash value would be of the $500,000? I don't think there was any testimony to that effect in the trial as to what that present cash value would be. I mean, certainly she would have gotten it in a long song, obviously at the time of his death, if in fact she survived him. But I don't think there was, there was no testimony as to the present cash value that I recall. I wasn't the trial attorney, but I don't think that evidence was ever submitted as to the present cash value. The final, and I know I'm getting close on time as well, but I'll do this as quick as I can. The final issue was the finding of dissipation that was made by the trial court. Trial court found that Melissa had dissipated $115,528.92, and it's our contention that that finding was against the manifest way to the evidence. Granted, there were some funds that she could not explain the use of. So I'm not arguing that there wasn't some dissipation that was proved, but there were certainly some things that were not dissipation. She testified that she took $3,500 out of the savings account in order to pay the real estate taxes. Clearly, that's not money being spent for her sole benefit and for a purpose unrelated to the marriage, which is normally how dissipation is defined. I clearly was paying the real estate taxes for the merit of real estate. She also spent money on a computer for their daughter in 2001, six years before the separation. That wasn't spent at a time when the marriage was undergoing an irretrievable breakdown. So that clearly shouldn't have been included in the funds that were found to have been dissipated. I'll stand on my brief with regard to the rest of the dissipation issue. You have the opportunity for a rebuttal. Thank you. Mr. Womack? The facts of this case are that this is a marriage of longstanding. A lot of assets, but not assets that were difficult to evaluate, to form a value model. Where no children, no children, that is, where you have, I'm sorry, where you have tough issues deciding who gets custody. No doubt that Melissa is entitled to maintenance. No doubt that she was entitled to a fair distribution of marital property. All that clear to anybody who's ever practiced law, except for you guys. Is she entitled to permanent maintenance? No, she's entitled to fair. She may be entitled to permanent maintenance, the judge might say that she's not, but the decision the judge made was reasonable and was the proper exercise of his discretion. He looked at two issues that parties couldn't agree at the time of trial on the value of the property, and he made a solemn-like decision. Okay, we'll sell it, and at that time, if he will then look at anybody's request, we'll look again at the amount of maintenance. Next issue was Jim's retirement, assuming the state can pay you guys the retirement when it comes to, I hope that's true. Absolutely. Ha ha ha ha ha. But if you, you have to look at this case in light of the underlying or the undertone of the case. Came out in the judge's order when he said that he recognized the scorched-earth policy of the defendant. The case was not about, from the beginning, how do we fairly divide the assets? How do we provide proper support? The case from the beginning was about trying to ruin Jim, and those aren't my words. I cited the quotes from the defendant in our brief. It's clear, it's clear wherever you look at this case that everything that you consider has to be based upon the fury that felt, hath no fury, like a woman's form, Melissa felt stormed, and may have had good reason to feel that way, but that's not relevant to the issues here, not relevant to the issues before the court. Perhaps she had the right to be upset and to feel stormed, but her attorney didn't, and the process that this court has to follow has to separate the storm, has to separate the emotions, and look at the assets of the estate. What was the purpose, then, of the maintenance? I'm sorry? What, then, do you believe was the purpose of the maintenance? Was it rehabilitative? I think the purpose of the maintenance was to recognize the facts of this case. You have two situations which, more likely than not, were going to occur, and the judge took that into consideration in making his decision. The first was the sale of the property. He ordered that to be done. Once that was done, let's say, for example, the market was down, the property comes back at $100,000. He would then allow anybody to come in, and certainly Melissa would have, and said, we don't have enough assets, we want money. And that was a reasonable thing for him to have done. He exercised his discretion doing that. The next thing is that, I think you would assume that at some point in time, Jim's going to retire. And if you listen carefully to the argument here and at the trial level, the request for maintenance at the trial level was more than the monthly income, more than the monthly income. And it kept changing back and forth. It had no relationship to any facts except what we want. But it's worse than that. The request was also for that maintenance plus the pension. So Melissa's asking the court to give you half of the pension money when it comes to it, the $5,000 to $10,000 amount that you want. The judge said, in this case, it's more likely than not true that the property's going to be sold. That's been resolved separately. More likely than not true that he's going to retire at some point. And when he retires, that would be the appropriate time to evaluate what's going on. And certainly Jim would come back in at that time and say, I'm paying $5,000 now, or $6,000. She receives that money through the pension plan. I shouldn't be paying $45,000 for this. But it's on his bird to do that, or she would receive it. So the question is, I don't have what you call rehabilitative or permanent. The question is, was the judge's decision a proper exercise of his discretion? I thought it was an extraordinary exercise of Solomon-like qualities, trying to decide how to handle the situation that's treated both sides fairly. It would be unfair to make Jim pay pension and maintenance. It would be unfair to punish Melissa if the property came back in a little money. He considered all those factors and crafted his proposal. Under present circumstances, either party could go back in right now and ask for a change in maintenance, because the property has been sold, in a manner of speaking, by the Green Party. She claims now that her assets aren't sufficient. She could say, the house really wasn't worth this much. I mean, this kind of deal's a bad deal. And do what she wanted to do. But the judge's decision was based on the facts of this case, was the best decision that could be made, taking into consideration trying to resolve the issues, and to avoid continual fighting and bickering and waste of money. So I think the decision was appropriate. Did I answer your question, Judge? I'm sorry. Yes, I think you did. Thank you. But you can't look at any of this stuff without looking at the underdog.  her financial statement said that her expenses were over $9,000 a month. Well, which financial statement? When Melissa was shown her financial statement at trial, she said, I've never seen that document. She said that her expenses for food were, when she and Jim were married, were $300 a month. But now that she's single, $900 a month. We talked about current need for a physical trainer, current need for physical therapy, over $1,000 a month. Not there anywhere. The court can't escape the fact that this isn't a lawsuit. And the burden of proof applies. And people had to meet that burden of proof. The facts of this case are, from the very outset, Jim agreed to put his entire check into the marital account. And from that, they would have been like they always had in the past. Melissa had sole control of the checking account, sole control over the checks and the canceled checks, sole control over all the records, and didn't make any effort to establish to meet her burden of proof. If you look at the record, you'll see something there called poor Melissa, an exhibit we refer to in the trial as poor Melissa exhibit. It was a printout by her daughter of some records that they acquired from the bank. Not the checks themselves. Couldn't find the canceled checks. Jim never had the canceled checks. They always had them. If you look at the testimony about what her expenses are, they are all over the place. She has no idea. I'm not sure how the judge arrived at $4,500 except trying to be fair. But she didn't substantiate any of those expenses. We've got $1,000 here for the cats and the dogs, and $500 here. It goes back and forth all over the place. But you have to look at it based upon what's really going on. This is not a case where I have to have $500 a month for my food. It's a case where I want to get all I can possibly get to punish you for what you did to me. Feelings may be valid, but they have nothing to do with this case. And that's what we have to look at. This case started out with an order of protection that was dissolved in about five minutes. It followed up by three order of protection by the defendant against the judge. Three petitions for contempt, none of which had any merit, none of which were granted. And then testimony at trial that my lawyer told me to not make any payments on the credit cards. Testimony at trial that her intent was to go to a gym. And that's where you get to do this. So if you look at everything that was done, the decision about maintenance was reasonable and was a strict test. In this case, it's a proper exercise of discretion. If you look at the amount of maintenance, again, $4,500 a month for a single person without a house payment, without anybody to support, the next thing is attorney fees. Attorney fees caused by filing an unnecessary and useless and worthless rule of emergency order for protection. Three motions for contempt about things that didn't exist. On and on and on and on. And then at trial, the judge says, one of the things I can take into consideration is were there efforts at trying to settle this case. I said, yep, there were. The bar said, no, no, no efforts at all. I introduced the evidence, the letters I had sent him to which he never responded, showing that the plaintiff tried to initiate settlement negotiations. No effort at all ever to talk about settlement. When you look at attorney fees, it's not just the ability to pay. It's whether those fees were reasonable at all, whether they should have been cleared. Now, we're talking, again, about one house, some land surrounding that house, bank stock, and insurance policies, and a bunch of personal property because they were like this. And that's it. That should take about 15 minutes to resolve that issue once you get down to deciding the value of the hardest thing. The problem would be the emotional problem. They might have to add any sand takes. So the judge came up with a good solution for that. But the rest of the stuff, all the litigation involved in this case, almost every bit of it was absolutely, totally unnecessary. You don't have an economist coming in to value the business. You don't have three or four people with different opinions about the value of the house or the value of the personal property. It was the personal property, for example, was fought over heavily, but almost always agreed to. And then you've got to consider, not nice to say this, not nice ladies, but you've got to consider the credibility of Melissa. It doesn't exist. You heard the first thing the counsel said was that she suffers from a diagnosis of common variable immune deficiency. The only person who made that diagnosis was Melissa. The medical records are in the chart. I went through them backwards and forwards. There's nothing in there where any doctor ever makes that diagnosis. Now, she's got lots of problems. She's entitled to maintenance. I'm not saying that she's not, but that goes only to the issue of credibility. Then if you look at the claims of under-expenses, totally under-expenses. You look at, she had all the records and couldn't account for $115,000. And even more could her lawyer. Nor would the counsel checks produce. All these things are the burden of the defendant, which were woefully inadequate. And then if you look at what was testified to, counsel says, well, her financial statement says this. It does say that. One of them does. One of them says something differently. The third one says something differently still. And she had no idea what they were. An example I gave back to you. Who is a good example? 331 for two, 900 for one. Well, what are the basis for $900 a month now? For food, well, I'm a type two diabetic and I have to eat special foods. But no receipts, no counsel checks, no nothing. No effort made to do it. You can't help but conclude, as the judge did, that this was not an effort to try to resolve these disputes. It was an effort to try to punish the judge. And that's why the torturer probably was upset by him as a conclusion in his ruling. We're not tied to perfect trials. We're not tied to perfect judgments. There may have been mistakes in this case. But it is clear here that the judge exercised his discretion appropriately in all of his decisions, reasonable and within the power that he has under the life insurance example. Counsel said, basically, that she wants the court case to be remanded so that the trial court can decide if there might be a need for additional life insurance. I've never heard an argument like that before. There was no testimony introduced at trial that $500,000 wasn't enough. There is dicta in the judge's order that talks about life insurance. But there's nothing wrong with that order, which, by the way, Jim volunteered to do in court. And nobody has offered any testimony, any basis to say that that's not enough. So we want to send it back to the trial court under the possibility that perhaps there doesn't make any sense. The amount of the maintenance was, the decision about maintenance was reasonable based on these facts. The amount was reasonable. Dissipation has not been proven by the defense. The amount of attorney fees were unreasonable because of the unreasonable conduct of the defendant. And the plaintiff should not be obligated to pay any of those unreasonable fees. It's the judge's decision. I have a question about the dissipation. There's a substantial amount of the dissipation found to be expenses for the party's daughter or payments made on her behalf. In the normal course of life, I recognize that Sarah's an adult, but I have two adult children, and they're still somewhat on the payroll. Is that really appropriate to say that that's dissipated assets? Well, it is for two reasons. First of all, while that claim was made, there were no facts to back that up. There were no records produced to back that up. Number two, I had two daughters who got married, and they buzzed an 8-4-2 to get that done at one of the tents. And I don't want to bring back nightmares just thinking about it. But they were in their early 20s. This is the young lady that the judge paid for her to go to Vanderbilt, paid for her to go to law school, paid for a tutor to help her with a bar exam, never passed the bar exam, paid for her graduate school after that. She's now 30 years old, living with a professor at the university who she finally marries. And the judge wasn't allowed to go to the wedding. Now, under those circumstances, is that a reasonable thing for the judge to do? No, no, it shouldn't be. And if they were, even in my house, where I get one vote, my wife gets five, even in my house, I get a vote. Even in my house, my wife said, we're going to rent the tent. Is that OK? He didn't get a vote. I mean, I know the answer to that. Of course, she asked the question. But he didn't get a vote. Not even particularly. Well, I understand the circumstances. But paying for a daughter's wedding, even a 30-year-old daughter's wedding, seems to be what normally would be a marital expense. At least not dissipation. Well, I guess there are two issues that you have to consider. First of all, the burden of proving that it was not dissipated was on us. And we don't have any bills showing that she paid this or that or the other, or those expenses. We don't have any records showing what the wedding cost and what it didn't cost. All of that was part of her burden. So was it testified to? Or was it just part of the affidavit? Or what? But these, uh. She testified. She testified on the exhibit that she produced about what her expenses were. She could not back them up. There were no canceled checks. There were no, for example, credit card bills couldn't be identified as this or that or the other. There were a lot. Melissa feels the need, for whatever reason, to continue to support her daughter, who is employed and is married to somebody who is also employed. After all this all is going on, there's also charges in there, for example, for adding or doing repairs to her daughter's home, which, again, is not an honor. Parents do that? Yeah. But they do it by agreement. It's not an obligation on the part of Jim to honor his wife's unilateral action to continue to provide support, which may or may not be needed, to an adult emancipated woman.  Thank you, Mr. Willman. I'm going to get back to you. Keep reading before you start your intersections. OK. Ms. Katz, rebuttal. Thank you. Uh-huh. I don't think the difference between reviewable maintenance and permanent maintenance is a trivial one. I think the fact that it's going to be James' burden to come back in if it had been a permanent maintenance award is a big difference between what the court ordered and what the court should have ordered. Let me ask you something. Could the court have designated it as permanent maintenance, reviewable upon one of these two things happening? I suppose the court would have done that. I wouldn't take issue with Mr. Willman's argument that certainly permanent maintenance would have been modifiable, and I think the retirement of James would have probably triggered a petition on his part to come back in and say, all right, she's going to be getting $6,000 a month or whatever it is, and therefore, I would like to reduce my maintenance. But it becomes his burden. I think to make it automatically reviewable under those circumstances is not the right decision. Except that these are known certainties in the sense that either if he retires, it is known that his income's going to be reduced. And because of the nature of his work, everybody that's on the bench knows pretty much what that'll be. Well, Your Honor, let's say, for example, that as soon as the court entered the judgment, he retired. I think the court might be able to argue, as you would in a case of somebody that voluntarily becomes unemployed in an effort to avoid child support or maintenance. The court might have said that wasn't done in good faith if it was being done, obviously, in an effort to avoid a maintenance obligation. So I think the court would have the ability to make sure that it was done in good faith and be a basis for reduction of a maintenance if at that point in time. But it's still his burden. And he has to show that he's unable to pay the maintenance. And I think that's an important distinction. And I don't think it's a trivial distinction. And I still would contend that the court should have awarded her permanent maintenance. Would you agree that it would, the mere fact that he is a judge, and if he retires, we know that his income will be reduced by a known percent, would you agree that that is a substantial change in circumstances? I think it's a substantial change. But you have to show more than that. You also have to show that because of that substantial change, I can't live up to my obligation anymore. And so I think he has to show, yes, things have changed. But it still becomes his burden to say, and I can't keep maintenance. He had a million in non-marital assets. The court might have said, I'm not going to reduce it. I mean, the court would have had that option at least. And I think that argument needed to be made by him. And it would have been his burden. With regard to the maintenance and the fact that this was all motivated by Melissa's desire for revenge, maintenance is a matter of survival for her. She had to have maintenance regardless of what might have been the motivation for asking for it. She had to live. And the court, by giving her $4,500 per month, still left. His net was almost $12,000. It was $11,900 and some change. So he still had $7,500 a month to live on. She's living on $4,500. And it's just, at that point in time, to say that she as one person ought to be able to live on $4,500. Well, he had $7,500, and he's one person. His house was also quite short. So the amount, with a 40-year marriage like that, I think the amount should have been closer to a 50% of the total income package. And it clearly was short of that. With regard to attorney fees, Judge Gaffney did make the finding that they were reasonable. That's right in the judgment that the amount that was charged of the $44,000 and change was a reasonable amount. It was fair and reasonable. That finding is right in the judgment. To say that she shouldn't have had her fees awarded because there was no need for this matter to go to trial, I don't think it was appropriate for the court to decide why this case did or didn't settle. Maybe Melissa wanted more than James was willing to give. Maybe James didn't offer enough. So for the court to make a finding saying that it's one party's fault or the other that this matter had to go to trial, I don't think it's appropriate. Settlement negotiations were supposed to be inadmissible. So I don't think the court should have speculated as to why the case had to be tried. The standard is 508A. If you've got one party with the inability to pay fees and the other party with the ability to pay fees, that's the standard I think the court should have used. And in only ordering $5,000 of the almost $45,000 in fees, it was not the appropriate decision and wasn't abuse of discretion. With regard to the dissipation argument, I would agree with Justice Appleton that I don't think paying for the daughter's wedding of $13,000 was, in fact, dissipation. And that's one of the arguments that I made in my brief. Certainly, spending $13,000 for their daughter's wedding was not being spent for her own benefit, for a purpose unrelated to the marriage. She paid for her daughter's wedding. But in addition, it was on the credit card that she was then ordered to pay. So it was part of the dissipation. And she was ordered to pay her own credit card. And there was clear testimony that that's how she put it on her, I think it was her chastity set. And that's where the $13,000 went. And that was part of her credit card bill that she was then ordered to pay. So she was kind of double whammy on that by it being found part of dissipation and it also being part of the credit card debt she had to pay. Thank you. Thank you. Thank you both for your arguments and briefs. And we'll take the matter under advisement or under a ruling. We now stand in recess.